IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**AMANDA R. ROHRS,**                        Case 3:14 CV 1349

    Plaintiff,                        Judge Jeffrey J. Helmick

    v.                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                        REPORT AND RECOMENDATION

## INTRODUCTION

Plaintiff Amanda Rohrs filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1383(c). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b) (1). (Non-document entry dated December 5, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in March 2011, alleging a disability onset date of June 1, 2009. (Tr. 151-59). Plaintiff applied for benefits due to mycoplasma infection, postural orthostatic tachycardia syndrome ("POTS"), and chronic fatigue. (Tr. 69). Her claim was denied initially (Tr. 69-76) and upon reconsideration (Tr. 77-85). Plaintiff requested a hearing before an administrative law judge ("ALJ") on October 20, 2011. (Tr. 105). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on March 12, 2013. (Tr. 43-67). The ALJ denied Plaintiff's claim for SSI benefits on April 4, 2013. (Tr. 16). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff filed the instant action on June 20, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### *Personal Background and Testimony*

Born September 5, 1987, Plaintiff was 23 years old at the time of her application. (Tr. 27). At the time of the hearing, she lived with her parents and younger sister in a house. (Tr. 47-48). She had her driver's license but she had trouble focusing or got light-headed so she usually had others drive her. (Tr. 48-49, 54). Plaintiff had completed high school and approximately two years of college and had never had a full time job. (Tr. 28, 49). She did work part time as a janitor in the summers of 2007 and 2008. (Tr. 49).

Plaintiff testified her chronic fatigue, low blood pressure, heart palpitations, and fainting prevented her from working. (Tr. 50). She estimated she could walk one city block without a break, after which she would be required to rest for about five minutes. (Tr. 50-51). She also estimated she could stand for less than five minutes at a time before she would get "warm and flushed", "get heart palpitations", and "become nauseous", ultimately leading to her passing out. (Tr. 51). Plaintiff further stated she had some problems bending down and standing up because it made her dizzy and light-headed. (Tr. 51).

However, she said she had no problem using her hands, had no weight lifting restrictions, and could regularly lift five pounds. (Tr. 51). She also stated she could sit without a break for about fifteen minutes to a half hour after which she would need to elevate her feet. (Tr. 52). Plaintiff reported sleeping nine hours a night and in addition to that, napped twice a week for about two hours. (Tr. 52). She also reported regularly feeling dizzy which required her to sit or

lay down. (Tr. 56). She testified she laid down about ten to fifteen times a day to relieve the pressure in her legs caused by blood pooling. (Tr. 57).

She saw her primary care physician about once every six months to a year but also regularly saw Drs. Grubb and Maludy, but none of them had put any restrictions on her walking. (Tr. 50). At her most recent appointment with Dr. Grubb, Plaintiff stated he recommended she try to exercise more but she denied that any other doctor had suggested she exercise in the past. (Tr. 53). She further stated she had no written or specific restrictions but doctors had recommended that she not lift, exercise, or over-exert herself. (Tr. 55). She also stated she wore compression pants and preferred to sit with her legs crossed because it prevented blood pooling in her legs. (Tr. 54). Plaintiff reported mild side effects from one medication, ProAmatine, but none of the others had adverse effects. (Tr. 59).

In terms of daily activities, Plaintiff stated she required occasional assistance to wash or blow dry her hair but was capable of simple cooking. (Tr. 52). She also occasionally put clothes away and tried to do the dishes. (Tr. 52). She reported she did a lot of drawing and sketching but could no longer do her old hobbies of basketball and walking because of her illness. (Tr. 53). Plaintiff stated she often did Sudoku puzzles and intended in the future to return to school to receive her degree in education. (Tr. 55). She testified she only left the house for doctor's appointments or to satisfy family obligations. (Tr. 56).

### *Relevant Medical Evidence*

*Luis Jauregui, M.D.*

Plaintiff was referred to Dr. Jauregui, an infectious disease specialist, in January 2009 when she was diagnosed with mycoplasma pneumonia. (Tr. 267, 279). She initially presented with fatigue, difficulty sleeping, problems with walking, and numbness and tingling in her feet

and legs. (Tr. 267). Dr. Jauregui's exam was normal except for "cold peripheral extremities with purplish discoloration of the skin in certain location of the hands". (Tr. 268). He recommended increased fluid intake and that Plaintiff see Dr. Maludy for diagnosis regarding the syncope.[1](Tr. 268).

In February 2009, Plaintiff reported overall improvement following a cycle of doxycycline to treat the mycoplasma pneumonia. (Tr. 266). Later that year, Dr. Jauregui saw Plaintiff again and she reported improvement with treatment for both fatigue and neurogenic syncope. (Tr. 264). Plaintiff reported feeling a lot better and expected to return to school in the fall, though she noted her energy level had still not returned to normal. (Tr. 264).

On May 11, 2010, Plaintiff met with Dr. Jauregui and reported "noticeable improvement in her fatigue" upon completion of an antibiotic regimen. (Tr. 263). Since completion, she had had no problems with fevers, chills, night sweats, or adenopathy. (Tr. 263). Upon physical examination, Dr. Jauregui found she was "basically normal." (Tr. 263). He concluded that her treatment for mycoplasma infection was complete and she should manage her cardiogenic syncope with Drs. Maludy and Grubb. (Tr. 263).

Plaintiff requested a follow-up visit with Dr. Jauregui on November 9, 2010 where she again complained of fatigue. (Tr. 261). Dr. Jauregui noted Plaintiff had unsuccessfully attempted to increase her fluid intake and tried support stockings, which were somewhat helpful. (Tr. 261). She reported she had difficulty completing online coursework because of trouble concentrating but Dr. Jauregui noted her memory was "okay". (Tr. 261). He said she had been trying to walk ten minutes a day but it was difficult due to the fatigue. (Tr. 261). He observed her blood

---

1. Syncope is a temporary suspension of consciousness due to generalized cerebral ischemia, also known as fainting. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1845 (Anne Marie Block et al. eds., 31st ed. 2007).

pressure as 123/84 and her heart rate and rhythm were also normal. (Tr. 261). He concluded at this time, that absent any infectious disease, her current condition was "primarily affected by the presence of the neurogenic syncope." (Tr. 262).

In March 2011, Plaintiff reported a "disabling degree of fatigue" to Dr. Jauregui. (Tr. 259). At that time, she stated on good days she could be active for about three to four hours but the rest of the time was spent either in bed or on the couch. (Tr. 259). He noted her blood pressure was 128/91, no adenopathy, and clear lungs but that she was thin and had difficulty moving fast. (Tr. 260). He prescribed azithromycin to combat what he suggested may be another bout of mycoplasma pneumonia. (Tr. 259).

Plaintiff returned to Dr. Jauregui in July 2011 with reports of chronic fatigue and "fairly profound neurogenic syncope" which she stated was exacerbated by the warmer weather. (Tr. 320). Plaintiff stated when indoors she was capable of an average energy level, was sleeping between nine and ten hours a night without interruption, and was looking to continue her education. (Tr. 320). He again referred her to the care of Drs. Maludy and Grubb as he did not believe her symptoms were related to an infection. (Tr. 320).

*Jeffrey Maludy, M.D.*

In February 2009, Dr. Maludy, a cardiologist, performed a tilt table test on Plaintiff and observed "orthostatic and vasodepressor type neurocardiogenic type syncope, with minimal cardioventilatory response." (Tr. 307). He also performed a stress test, the results of which were normal. (Tr. 309). He diagnosed Plaintiff with POTS and noted she was resistant to medical therapy with persistent symptoms. (Tr. 395). Plaintiff had a normal echocardiogram in November 2010. (Tr. 400).

On April 26, 2011, Dr. Maludy reported Plaintiff had experienced increased fatigue since January with occasional light-headedness. (Tr. 304). Plaintiff denied chest pain, palpitations, dizziness, pre-syncope, syncope, and dyspnea on exertion. (Tr. 304). Plaintiff reported her symptoms as a two or three on a ten-point severity scale. (Tr. 304). Dr. Maludy noted Plaintiff was "not routinely compliant with hydration, [or] nutrition" goals but continued the current course of treatment, including prescriptions for Adderall, ProAmitine, Florinef, Propranolol, and use of compression stockings. (Tr. 304). He recommended low sodium, low saturated fat, and reduced carbohydrate diet and a consult for enhanced external counter pulsation ("EECP") therapy to improve blood flow to the heart. (Tr. 304).

Despite earlier improvements due to the EECP, Plaintiff's symptoms reappeared in November 2011 and she stated while she had felt better going through EECP, her energy level had since declined again. (Tr. 498, 504). Plaintiff stated with compression pants and EECP she was able to prolong physical activity. (Tr. 504). Dr. Maludy noted Plaintiff was usually compliant with her medication, fairly compliant with diet recommendations, but still not getting regular exercise. (Tr. 498). Dr. Maludy recommended another round of the EECP treatments and continued with his other treatment recommendations. (Tr. 498).

On January 12, 2012, Plaintiff stated she was light-headed and imbalanced, with high intensity episodes within the last two months. (Tr. 488). She reported that position changes and extreme heat worsened her condition but laying down relieved her symptoms. (Tr. 488). Dr. Maludy concluded there was room for improvement in combatting the syncope but continued his treatment course. (Tr. 489). In February and April 2012, Plaintiff returned to Dr. Maludy alleging near syncope and palpitations but on both occasions she denied syncope. (Tr. 480, 484).

Dr. Maludy continued his treatment plan and counseled Plaintiff on the importance of compliance with his recommendations regarding salt, hydration, and exercise. (Tr. 482, 484).

In July 2012, Plaintiff complained of ischemia, dizziness, and light-headedness, but reported that she had only had one pre-syncopal episode in the past three months. (Tr. 474). Again, Dr. Maludy rated Plaintiff as resistant to therapy but reported that she was not compliant with his hydration, nutrition, and exercise recommendations. (Tr. 474). She again rated her symptom severity as two or three on a ten-point scale. (Tr. 474).

*Blair Grubb, M.D.*

After a referral, Plaintiff was seen by Dr. Grubb, a cardiologist/electrophysiologist, at the University of Toledo Medical Center in April 2010. (Tr. 371). She reported to him the same symptoms as to Dr. Maludy, including pre-syncope, difficulty walking, and muscle weakness. (Tr. 371). Upon physical examination, Plaintiff had no irregularities. (Tr. 373). He confirmed the POTS diagnosis and prescribed a course of reconditioning, working toward a goal of at least twenty minutes of aerobic activity three times a week. (Tr. 299).   Dr. Grubb's care plan also included increase in salt and fluid intake and medication. (Tr. 374).

*Beverly Karabin, N.P.*

In July 2010, Plaintiff was seen by Beverly Karabin, a nurse practitioner in Dr. Grubb's office, she reported fatigue and light-headedness although she had no syncope and stable blood pressure. (Tr. 296). On September 9, 2010, she was again seen by Ms. Karabin. (Tr. 294). Ms. Karabin noted Plaintiff was fairly stable, had no syncope, but breakthrough tachycardic episodes. (Tr. 294). In both instances, Ms. Karabin continued the treatment plan prescribed by Dr. Grubb. (Tr. 294, 296).

In January 2011, Plaintiff followed up with Ms. Karabin. (Tr. 292-93). She noted Plaintiff was having a good response to Adderall, and that in combination with her other medication, she had had improvement in her fatigue symptoms. (Tr. 292). Ms. Karabin reported Plaintiff had a blood pressure of 128/90 and was "without any excess of upright tachycardia." (Tr. 292). Ms. Karabin observed no shortness of breath, palpitations, chest pain, or numbness, but did note Plaintiff was experiencing dizziness. (Tr. 352). She believed Plaintiff was doing relatively well, continued all her medications and the course of reconditioning. (Tr. 292).

Plaintiff returned to Ms. Karabin in April 2012 where she reported light-headedness, dizziness, and frequent near syncope, but no syncope, vertigo, palpitations, fatigue, or chest pain. (Tr. 523). Ms. Karabin prescribed Adderall and advised Plaintiff to continue to improve her diet. (Tr. 524-26). On October 9, 2012, Plaintiff followed up with Ms. Karabin and she noted her fatigue had improved and the dizziness and light-headedness were primarily contained to the evenings. (Tr. 528). She also stated she was busy trying to "clean house", sell items on Ebay, and working on art projects. (Tr. 528). Ms. Karabin encouraged Plaintiff to restart her exercise program, continue eating well, and decrease her Florinef dosage. (Tr. 528).

***Opinion Evidence***

On November 17, 2010, Dr. Grubb wrote a letter describing the potential symptoms of POTS. (Tr. 256-57). Dr. Grubb stated that, in general, POTS sufferers cannot maintain vascular resistance in the face of gravitational stress, i.e. blood flow is inhibited in the central regions because it pools in the extremities. (Tr. 256). This can cause increase in heart rate and mild contractility in the heart. (Tr. 256). Dr. Grubb stated many patients, though not universal, complain of postural fatigue, exercise intolerance, tachycardia, near-syncope, and migraine headaches. (Tr. 256). He further expanded the symptom list to include generalized weakness,

visual disturbances, mood swings, brain fog, forgetfulness, and inability to concentrate. (Tr. 257). Dr. Grubb stated, in general "…the constellation of symptoms…can indeed interfere with rigorous work/academic environment, as well as inhibit positive quality of life", however he did not note from which symptoms Plaintiff suffered. (Tr. 257). Lastly, Dr. Grubb concluded Plaintiff's symptoms prevented her from performing any type of work. (Tr. 257).

On February 22, 2013, Dr. Maludy completed a work-related activities opinion regarding Plaintiff where he opined she could rarely lift up to five pounds; stand/walk/sit for less than one hour a day; stand/walk/sit without interruption for less than one minute; could never climb, balance, stoop, crouch, kneel, or crawl; was adversely affected in reaching, handling, feeling, pushing/pulling, seeing, hearing, and speaking; would be off task 25% of the time or more; and would miss more than four days a month. (Tr. 535-36). He further opined that due to her illness she was "incapable of even 'low stress' work" and would need to take frequent, unscheduled breaks to lie down. (Tr. 537). Lastly, in a mental capacity evaluation he concluded that Plaintiff would not be able to perform any of listed tasks on a reliable or sustained schedule, except that she was capable of some social interaction. (Tr. 539-40).

***Consultative Examiner***

On September 7, 2012, Plaintiff was seen by Babatunde Onamusi, M.D., for a consultative examination. (Tr. 231). Dr. Onamusi observed Plaintiff was able to walk with a normal gait, could get on and off the examination table without assistance, had a full range of motion, and was able to squat, kneel, and walk. (Tr. 509, 513-16). He concluded Plaintiff was able to sit for four to five hours, stand for one hour, and walk for one hour all without interruption; lift up to twenty pounds; perform either gross or fine motor tasks; but could never

be exposed to unprotected heights. (Tr. 516-22). He opined that Plaintiff was able to perform "light physical demand level activities". (Tr. 510).

### State Agency Examiners

In May 2011, state agency consultant, Jerry McCloud M.D., reviewed Plaintiff's medical records. (Tr. 64-70). He found Plaintiff had both exertional and postural limitations due to fatigue. (Tr. 73-74). However, while he acknowledged Dr. Maludy's opinion and included some of his suggestions in his RFC, he concluded that "the severity [of Dr. Maludy's opinion] does not have consistent medical support." (Tr. 74). Dr. McCloud also noted Dr. Grubb's opinion was more restrictive than his own but stated "[Dr. Grubb's] opinion relies heavily on the subjective reports of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion." (Tr. 74-75).

On October 1, 2011, Elizabeth Das M.D., reviewed Plaintiff's medical file. (Tr. 85). She expressed the same concerns about Drs. Maludy and Grubb's opinions, i.e. that they did not have support in the record, and believed that Plaintiff was capable of sedentary work. (Tr. 83-86).

### VE Testimony and ALJ Decision

The ALJ proposed a hypothetical residual functional capacity ("RFC") for sedentary work that allows for a sit/stand option at will, providing the person was not off task more than 10% of the time. (Tr. 62). There would be no climbing ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs; and frequent balancing, stooping, kneeling, crouching, and crawling. (Tr. 62). This person had a manipulative limitation for frequent use of the bilateral upper extremities for reaching, handling, and fingering; frequent use of the bilateral lower extremities for operation of foot controls; and could not be exposed to hazards such as moving machinery, unprotected heights, or loud noises. (Tr. 62).

10

Based on this hypothetical, the VE testified that while the available work would be limited by the sit/stand option, approximately 50% of the sedentary work base would be available to this person. (Tr. 62-63). Particularly, Plaintiff could perform the duties of order clerk, sorter packager, and checker layer, all of which had at least 3,500 jobs in the state economy. (Tr. 63).

In a second hypothetical, the ALJ kept everything the same but restricted the person to no use of their bilateral upper or lower extremities, and the VE testified that no work would be available for that person. (Tr. 63). The VE further testified that absent special accommodations, a position would not be available for a person who needed more than the average break from work hours and more absences than one per month. (Tr. 64).

On cross-examination, the VE testified that without special accommodations, no jobs would be available if the person was required to sit on the floor or cross their legs after standing for five minutes. (Tr. 65). The Plaintiff's attorney further questioned the VE regarding whether a person who could only lift five pounds and not stand or sit for more than one hour at a time would be employable; the VE answered they would not. (Tr. 65-66). Lastly, the VE responded that a person who needed to take unscheduled breaks would not be eligible for competitive employment. (Tr. 66).

Following the hearing, the ALJ found Plaintiff had the severe impairments of POTS, chronic fatigue syndrome, status-post mycoplasma pneumonia, and history of neurocardiogenic syncope; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 21-22). The ALJ then found Plaintiff had the RFC to perform sedentary work that allows for a sit/stand option at will, providing Plaintiff was not off task more than 10% of the time. (Tr. 62). No climbing ladders, ropes, or scaffolds; only occasional climbing of ramps or stairs; and

11

frequent balancing, stooping, kneeling, crouching, and crawling. (Tr. 62). And a manipulative limitation for frequent use of the bilateral upper extremities for reaching, handling, and fingering; frequent use of the bilateral lower extremities for operation of foot controls; and could not be exposed to hazards such as moving machinery, unprotected heights, or loud noises. (Tr. 62).

Based on the record, Plaintiff's testimony, and the VE testimony, the ALJ found Plaintiff could perform work as an order clerk, sorter/packager, and checker weigher; and thus was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

13

DISCUSSION

Plaintiff argues the ALJ erred because (1) he did not give controlling weight to her treating physicians and further failed to give good reasons for this lesser weight; (2) erred in giving weight to the opinions of the consultative and state agency examiners; and (3) failed to meet his burden at Step Five to establish the VE testimony was reliable evidence upon which to base his RFC. (Doc. 14, at 15, 22). Each argument will be addressed in turn.

### *Treating Physician Rule*

Plaintiff argues the ALJ erred in only giving "little weight" to the opinions of Drs. Maludy and Grubb instead of the controlling weight a treating physician should receive. (Tr. 25-26; Doc. 14, at 15-21). Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An ongoing treatment relationship will exist when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice". § 404.1502.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

14

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Blair Grubb*

Preliminarily, this Court must discuss whether Dr. Grubb had established an "ongoing treatment relationship" with Plaintiff at the time he wrote his letter, and if so, whether the ALJ

appropriately determined its weight. *See* 20 C.F.R. § 416.902.

Dr. Grubb rendered his opinion in November 2010, about six months after seeing Plaintiff for the first and only time. (Tr. 256-57). Even if the Court were to credit the appointments with Ms. Karabin, a member of Dr. Grubb's staff, as supplementing his treating relationship with Plaintiff, she still would only have been seen by his office three times in the six month period. (Tr. 256, 294, 296). This is not sufficient to create a "longitudinal picture of [Plaintiff's] medical impairments", *Rogers*, 486 F.3d at 242, and the ALJ alluded to as much in his opinion. (Tr. 25). *See e.g., Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) ("[T]he assumption that the opinion of a treating physician warrant greater credit than the opinions of [others] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration."); *Helm v Comm'r of Soc. Sec.,* 405 F. App'x 997, 1000 n.3 (6th Cir. 2011); *Yamin v. Comm'r of Soc. Sec.,* 67 F. App'x 883, 885 (6th Cir. 2003). The treating physician rule is intended to grant deference to those medical sources that have a detailed and complete picture of the Plaintiff's medical history; that rationale does not apply to Dr. Grubb's letter.

Although, Dr. Grubb was not a treating source at the time he wrote the letter, the ALJ is still required to determine the weight of his opinion. §§ 416.902, 416.927. The factors for determining the weight of a non-treating source opinion are the same as those listed above; as well any fact "which tend[s] to support or contradict the opinion". § 404.1527(c).

The ALJ stated he gave Dr. Grubb's opinion little weight because it was given early in the relationship, was inconsistent with the record evidence, and made a disability determination. (Tr. 25). Particularly relevant was the opinion was rendered within six months of Plaintiff's first visit and there was evidence that Plaintiff had "significantly improved" since the opinion was

given. (Tr. 25). The ALJ specifically referenced Plaintiff's last three appointments with Ms. Karabian in January 2011, April 2012, and October 2012, noting Plaintiff had shown stable or improved symptoms at each visit. (Tr. 25, 292-93, 352, 524-28). He also cited examples of Plaintiff's activities of daily living, such as her intent to return to school and her work on art projects; which showed her symptoms were improving. (Tr. 25). Furthermore, the opinion of a medical source in regard to disability status is not persuasive, as it is the sole responsibility of the ALJ to determine disability. *Schuler v. Comm'r of Soc. Sec.*, 109 F.App'x 97, 101 (6th Cir. 2004). The ALJ adequately explained why he afforded Dr. Grubb's letter, the opinion of a non-treating source, little weight and thus, the Court affirms the ALJ's conclusion.

*Dr. Jeffrey Maludy*

Turning now to Dr. Maludy's opinion, it was rendered after almost four years of consistently treating Plaintiff, thus he was a treating source whose opinion, absent good reasons, was entitled to controlling weight. *Rogers*, 486 F.3d at 242. The ALJ afforded Dr. Maludy's opinion little weight because it was inconsistent with the medical record and Plaintiff's activities of daily living and appeared to be based only on Plaintiff's subjective complaints. (Tr. 25-26).

Plaintiff argues the ALJ erred because he did not specifically address which of these reasons, if any, refuted the presumption of controlling weight owed to a treating physician. *See Gayheart,* 710 F.3d at 376-77. While not explicitly labeled as reasons, the ALJ clearly discusses both underlying controlling-weight factors−objective medical evidence and consistency−in his opinion. (Tr. 25). The ALJ summarized the available objective medical findings, citing the tilt table test, electrocardiograms, stress tests, echocardiograms, blood pressures, and blood work. The majority of these tests showed normal or unremarkable findings, and thus, did not support the extreme limitations stated by Dr. Maludy. (Tr. 25).

17

Then the ALJ directly referenced the medical evidence that was inconsistent with Dr. Maludy's opinion, particularly that at her last appointment before he rendered his opinion she reported only occasional light-headedness, denied chest pain, palpitations, and syncope, had only one episode of near syncope in the preceding three months, and rated her symptom severity as, at most, a three out of ten. (Tr. 25, 474). It is evident from a review of the ALJ's opinion that he considered the factors inherent in a determination not to give controlling weight, even if he did not particularly label them as such. *See Dunlap v. Comm'r of Soc. Sec.,* 509 F. App'x 472, 476 (6th Cir. 2012) (holding the ALJ's failure to label his explanation as "good reasons" was not error).

Next, the ALJ proceeded on with his reasons for according little weight to Dr. Maludy's opinion, most notably because it was inconsistent with the record evidence which did not support the "extreme mental and physical limitations" stated. (Tr. 25). For example, Plaintiff consistently showed improvement, or at the very least stabilization, throughout her treatment; as evidenced by her static treatment plan. (Tr. 263, 264, 292-94, 528). In addition to the "treatment notes and clinical findings that suggest claimant's conditions have improved", the ALJ found that Plaintiff's activities of daily living, such as doing artwork, puzzles, and selling items on E-bay, were not consistent with Dr. Maludy's mental restrictions. (Tr. 25-26, 52-55, 528). In fact, prior to Dr. Maludy's opinion which alleged Plaintiff had severe restrictions in almost every category of mental and social functioning, Plaintiff's mental capacity was not questioned. (Tr. 539-40).

Lastly, the ALJ concluded that Dr. Maludy's opinion was based primarily on Plaintiff's self-reported limitations and not on the objective evidence. (Tr. 26). "A doctor's report that merely repeats the Plaintiff's assertions is not . . . entitled to protections of the good reasons rule." *Mitchell v. Comm'r of Soc. Sec.,* 330 F. App'x 563, 569 (6th Cir. 2009). Here, the ALJ

18

found, perhaps inappropriately, that these restrictions were based solely on a desire to help further Plaintiff's SSI claim. Regardless, the ALJ found both the physical and mental restrictions departed so substantially from the record evidence that he could only conclude they were based on the Plaintiff's subjective complaints, and thus Dr. Maludy's opinion was given less weight. (Tr. 26).

While it is true that a stable and controlled condition, as evidenced by the medical evidence, does not necessarily equate to ability to work; the ALJ provided more than a scintilla of evidence to support his findings regarding the weight given the opinions. *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). As such, his conclusions were reasonable when compared with available evidence. *Id.* Even if substantial evidence or indeed a preponderance of the evidence supports Plaintiff's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

*Consultative and State Agency Examiners*

Further, Plaintiff argues the ALJ erred by giving any weight to the opinions of the consultative and state agency examiners. (Doc. 14, at 21). Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source; second, is non-treating sources, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

When evaluating a non-treating or non-examining source opinion, the same factors are used to determine weight as stated above for a treating source. § 404.1527(c). An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,*

19

375 F.3d 387, 391 (6th Cir. 2004), but this is not so if a non-treating or non-examining source is involved. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murry v. Comm'r of Soc. Sec*., 2013 WL 5428734, at *4 (finding "[n]otably, the procedural 'good reasons' requirement does not apply to non-treating physicians.").

Here, the ALJ accorded significant weight to the consultative examiner and some weight to the state agency physicians. (Tr. 27). Plaintiff argues the ALJ erred in giving their opinions any weight because none of these examiners were specialists in the field, like Drs. Maludy or Grubb. (Doc. 14, at 21). While this is true, specialization is not the only relevant factor in determining the weight given to opinions; the ALJ may consider any of the regulatory factors.

In his opinion, the ALJ summarized the medical findings of Dr. Onamusi noting particularly there were no abnormal findings in his physical examination of Plaintiff. (Tr. 27). He concluded that Dr. Onamusi's opinion was consistent with the medical record as a whole because it also showed Plaintiff had "recovered well and that her overall functionality had significantly improved." (Tr. 27, 263, 264, 294, 292-93, 528). Similarly, the ALJ concluded the state agency examiners, "experts in Social Security disability evaluation", § 404.1512(b)(8), identified specific areas of limitation. (Tr. 27). However, he also indicated that the hearing testimony regarding Plaintiff's symptoms caused him to give their opinions only some weight. (Tr. 27). Furthermore, the ALJ determined Plaintiff was more restricted than either Dr. Onamusi or the state agency examiners concluded and he assigned her an RFC for only a reduced range of sedentary work. (Tr. 22, 27).

The ALJ adequately explained why he gave the assigned weights to the opinions of the consultative and state agency examiners. Even if the Court were to construe the evidence as

20

Plaintiff contends, substantial evidence exists to support the findings made by the ALJ and thus the Court will not overturn them. *Jones,* 336 F.3d at 477.

***Step Five***

Lastly, Plaintiff argues the ALJ erred at Step Five because the hypotheticals he presented to the VE did not accurately represent Plaintiff's abilities and the jobs the VE testified existed did not exist in significant numbers in the region. (Doc. 14, at 22-25). Specifically, Plaintiff alleges the ALJ did not have credible evidence to support the hypotheticals presented because they did not reflect Plaintiff's restrictions, as noted by Drs. Grubb and Maludy.

To meet the burden at Step Five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id*. If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

21

First, the ALJ's hypothetical, supposing a sedentary level of work with a sit/stand option, was consistent with Plaintiff's physical condition. This determination is supported by substantial evidence in the record, for example at various times Plaintiff reported different capabilities to walk, sit, and stand; (Tr. 50-52, 509) but medical records also show she was placed under no activity restrictions, had normal physical examinations, was encouraged to exercise to improve stamina, was capable of sustained energy levels, and had relatively controlled syncope (Tr. 50, 55, 259, 263, 299, 304, 320, 373-74, 482, 484, 474, 498, 504, 524, 528). All of these lend support to the hypothetical, and later the RFC, because it accounted for Plaintiff's exertional limitations by allowing a sit/stand option at the Plaintiff's discretion. Plaintiff also argues the ALJ should have included a cross-leg requirement for all sitting, however the ALJ appropriately found the restriction unfounded because of his evaluation regarding Plaintiff's credibility and the lack of support for such restriction in the medical record. (Tr. 24). Thus, the hypothetical adequately represented Plaintiff's physical abilities, was based on substantial evidence, and therefore, was an appropriate basis on which the ALJ could rely.

Second, the ALJ appropriately accounted for any attendant mental limitations that may result from Plaintiff's physical situation in the hypotheticals posed to the VE. Specifically, he allowed the individual to be off task ten percent of the time. (Tr. 62). Aside from Dr. Maludy's mental evaluation, which is almost wholly unsupported by the record, there is little evidence of any mental or social limitations. Plaintiff did complain of difficulty focusing occasionally (Tr. 48, 261) but more often testified to drawing, sketching, doing puzzles, and working towards returning to college (Tr. 55, 49, 264, 320). At other times, she reported she could maintain activity for three to four hours, and maybe more if she is indoors. (Tr. 263, 320). These are examples that Plaintiff was clearly capable of performing tasks on a sustained basis, with only

minor interruptions as a result of her physical condition. Thus, the hypothetical was an appropriate representation of Plaintiff on which the VE could testify and the ALJ could rely.

Lastly, Plaintiff contends the ALJ erred by accepting the VE testimony because the number of available jobs was not sufficient. 42 U.S.C. §4239(d)(2)(A); 20 C.F.R. §404.1566(b). However, Plaintiff's argument fails because a "significant number" of available jobs has no threshold minimum and it is left to the discretion of this Court to determine if they exist in sufficient number. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). Here, although the VE stated the sit/stand option would reduce the available jobs by 50%; he also opined that in three different positions each would have at least 3,500 positions in the state, and further these three positions were not exclusive but rather representative of those available. (Tr. 63). In this Court's opinion at least 11,000 positions is sufficient to meet the statutory and regulatory requirements. *See Nejat v. Comm'r of Soc. Sec.*, 359, F. App'x 574 (6th Cir. 2009) (finding that 2,000 jobs constituted a significant number).

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.


  s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).